# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **PATRICIA NOVY,** ) | |
| ) | |
| Plaintiff, ) | Case No. 05 C 2090 |
| ) | |
| v. ) | Magistrate Judge |
| ) | Martin C. Ashman |
| **JO ANNE B. BARNHART,** ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U.S.C. § 405(g),[1] Plaintiff, Patricia Novy, seeks judicial review of the final

decision of Defendant, Jo Anne B. Barnhart, Commissioner of the Social Security

Administration ("Commissioner"), who determined that Novy was not entitled to Supplemental

Security Income ("SSI").[2] Before this Court are Plaintiff's motion for summary judgment, which

requests this Court to reverse and remand the Commissioner's decision that Plaintiff was not

entitled to SSI, and the Commissioner's motion for summary judgment, which requests this Court

to affirm her decision. Both parties have consented to have this Court conduct any and all

---

[1] "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . ." 42 U.S.C. § 405(g).

[2] SSI provides financial assistance to needy individuals who are sixty-five years of age or older, are blind, or are eighteen years of age and permanently and totally disabled. 42 U.S.C. §§ 1381-82.

proceedings in this case, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(b). For the reasons set forth below, this Court upholds the Commissioner's decision and grants her motion for summary judgment.

## I. Procedural History

On October 17, 2001, Plaintiff applied for SSI, alleging that she had been disabled since August 1, 1987. Plaintiff's application for benefits was denied initially and upon reconsideration. (R. at 26-29, 33-36.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was conducted before ALJ Percival Harmon on January 5, 2004. (R. at 16, 290.) At the hearing, Plaintiff, who was represented by attorney Greta Doumanian, testified, as did vocational expert ("VE") Richard Hamersma. On March 26, 2004, the ALJ rendered his decision and found Plaintiff not disabled because she could perform a significant number of jobs in the national economy. (R. at 16-23.) The Social Security Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 5-7.) Plaintiff now seeks judicial review of that decision.

## II. Background Facts

### A. Plaintiff's Background

Plaintiff was born on October 19, 1968, and was thirty-five years old at the time of the ALJ's decision. (R. at 300.) Plaintiff completed the eighth grade but had always been placed in special education classes. (R. at 300-01.) At the time of the ALJ hearing, Plaintiff was working towards earning her General Educational Development certification ("GED"). (Id.) Plaintiff

claims that she failed the GED exam once already, by approximately twenty-seven points.[3] Plaintiff had no past relevant work experience. (R. at 20, 336.) Plaintiff claims that she became disabled on August 1, 1987, due to mild scoliosis of the lower spine, stress and depression. (R. at 60, 73.)

## B. Medical Evidence

In early 2000, the Illinois Department of Human Services referred Plaintiff to the University of Chicago Hospital's Affective Disorders Clinic for an evaluation and to Mercy Hospital and Medical Center for services because of Plaintiff's inability to follow through with services recommended for her children. (R. at 110, 190.) Reports prepared on March 2, 2000, by Ms. Laura Pancow, LCSW, and Dr. Daniel Giacomo, M.D., showed some normal findings but indicated several abnormalities, including that Plaintiff's memory was not within normal limits, her process of abstracting was not good, and her judgment was not intact. (R. at 110-13.) These reports diagnosed Plaintiff with a learning disorder NOS, a global assessment functioning ("GAF") at 45 current and at a high of 50 for the past year,[4] but ruled out generalized anxiety disorder.

---

[3] The GED is a series of five tests. In Illinois, GED candidates must achieve a standard score of 410 or above on each of the five tests and a total standard score of 2,250 or above for the entire battery. *See* GED Illinois, *available at* http://www.gedillinois.org.

[4] GAF represents the doctor's assessment of the person's overall level of functioning. A GAF between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 32 (4th ed. Text revision 2000).

- 3 -

A neuropsychological evaluation was performed by Dr. Diane S. Goldstein, Ph.D., at the University of Chicago Hospital on March 30, 2000. (R. at 114.) IQ tests administered during the evaluation showed that Plaintiff had a full scale IQ of 69, verbal IQ of 72 and performance IQ of 70. (R. at 115.) These scores placed Plaintiff in the extremely low/borderline range relative to her same-aged peers. (Id.) Portions of the report suggested that the test results in general might underestimate Plaintiff's capabilities because she would quit easily. (R. at 115-16.) However, the portion of the report that summarized the test findings explicitly questioned only the full scale IQ scores and not the verbal or performance IQ scores. (R. at 115, 153.) Dr. Goldstein reported that Plaintiff's verbal abstraction ability and attention/concentration were in the low average range, and Plaintiff was moderately impaired in the areas of social judgment, expressive vocabulary, nonverbal problem-solving/syllogistic reasoning, and visuomotor scanning. (R. at 115.) Dr. Goldstein also reported that Plaintiff experiences recurrent anxiety and has feelings of depression, resentment and hopelessness. (R. at 114-16.)

On November 16, 2001, Dr. Norton B. Knopf, Ph.D., performed a psychological evaluation of Plaintiff on behalf of the Social Security Administration ("SSA"). (R. at 136-40.) Plaintiff reported a history of sexual abuse as a child and moderate depression and anxiety with frequent episodes of both within the last six months. (R. at 138.) Plaintiff reported experiencing common symptoms of depression, including fatigue, guilt, and sleep disturbance, and common symptoms of anxiety, including palpitations, gastrointestinal problems, and shortness of breath. (R. at 137.) On status mental examination, Dr. Knopf reported that Plaintiff exhibited normal attention and concentration skills and some abnormalities with explaining simple proverbs and performing some calculations. Plaintiff was diagnosed with adjustment disorder with mixed

anxiety and depressed mood, chronic; and rule out borderline intellectual functioning ("BIF").
(R. at 140.)

State Agency examiner, Dr. M.A. Wharton, Psy.D., reviewed all of Plaintiff's medical evidence of record on November 30, 2001, and completed a psychiatric review technique form. (R. at 141-54.) Dr. Wharton expressly stated that he was evaluating the record to determine if Plaintiff's mental impairment met or equaled any of the impairments set out by the Commissioner in appendix 20 C.F.R. § 404, Subpt. P, App. 1, including Listing 12.05 for mental retardation. Dr. Wharton determined that Plaintiff's mental impairment did not "precisely satisfy the diagnostic criteria" of Listing 12.05(C), and stated that Plaintiff suffered from BIF. (R. at 145.) Dr. Wharton expressly referenced Plaintiff's March 30, 2000 neuropsychological evaluation and November 16, 2001 evaluation. (R. at 153.) In assessing Plaintiff's mental residual functional capacity ("MRFC") Dr. Wharton determined that Plaintiff's ability to maintain attention and concentration for extended periods of time was moderately limited, her BIF and depression would interfere with her performance of complex tasks, but she had the ability to perform and sustain simple tasks. (R. at 155-58.)

Between September 2001 and December 2002, Plaintiff received therapy at Mercy Hospital's Mental Health Center from Ms. Michelle Haptonstahl, LCSW. (R. at 191-99, 209.) Plaintiff was diagnosed with major depression or dysthymia, BIF or a learning disability, and post traumatic stress disorder ("PTSD") due to a history of sexual abuse NOS. (R. at 184-85.) Mercy Hospital treatment records describe Plaintiff as having a mood impairment, confusion, lack of trust, marginal ability to navigate social encounters and activities of daily living, memory problems, and poor attention and concentration. (R. at 186-88.) Treatment records from Mercy

- 5 -

accepted the University of Chicago test results placing Plaintiff's full scale IQ at 69. (R. at 184-85, 193, 196.) Ms. Haptonstahl placed Plaintiff's GAF at 50 and the highest it had been in the preceding year at 50. (R. at 184-85.) Ms. Haptonstahl also described Plaintiff as "not well focused" and having "marginal ability to manage demands of parenting" her children. (R. at 193-94.)

As of July 2003, Plaintiff began seeing a different therapist, Ms. Dianne Glenn. (R. at 205-06.) Plaintiff was still seeing Ms. Glenn at the time of the ALJ hearing. (R. at 328.) Ms. Glenn's therapy notes indicated that Plaintiff experienced conflict with family members, problems in an intimate relationship, and that Plaintiff felt helpless and overwhelmed. (R. at 206-07, 210.) Treatment records reflect that Plaintiff's symptoms improved after an alleged incident of sexual abuse involving Plaintiff's daughter and another family member proved to be unfounded. (R. at 210-13.) However, subsequent treatment notes from Ms. Glenn and others indicate ongoing depression and PTSD on a long-standing basis. (R. at 214, 217, 236, 258.)

Dr. Qureshi, Plaintiff's treating physician at Jackson Park Hospital from September 2002 to December 2003, noted anxiety, depression, and PTSD, and suggested that Plaintiff may suffer from an anxiety disorder or panic attacks. (R. at 216, 225.)

Plaintiff reported back problems and, in June 2001, an MRI demonstrated that Plaintiff had mild scoliosis of the lower thoracic spine with minimal degenerative changes in her mid-thoracic spine. (R. at 118.) On January 10, 2002, an SSA consultative internal medical examination observed that Plaintiff complained of pain upon range of motion in the lumber spine and the doctor noted some limitation of motion with bending and flexion. (R. at 159, 161-62.) According to hospital records, Plaintiff also had an annulus tear at L5-S1. (R. at 232.) Plaintiff

received treatment for low back pain consisting primarily of physical therapy and over-the-counter pain medication. (R. at 165, 299-300.) Specifically, Plaintiff was receiving treatment from Dr. Qureshi at Jackson Park Hospital in 2002 and 2003, including some physical therapy for chronic lower back pain. (R. at 215-44.) At the time of the hearing, Plaintiff was not receiving physical therapy due to concerns over insurance coverage and Plaintiff's desire to obtain therapy at a different location. (R. at 296.) Plaintiff reported some improvements due to the physical therapy. (R. at 226, 229.)

In December 2003, Plaintiff was prescribed a lumbar brace, (R. at 216), however she had not filled the prescription by the time of the ALJ hearing, due to her concerns regarding insurance coverage. (R. at 313.) In the meantime, therapists at Mercy Hospital provided Plaintiff with a lumbar support cushion to place behind her back while sitting, and she uses that cushion regularly. (R. at 313-14.)

## C.    Plaintiff's Testimony

Plaintiff testified that she lives in an apartment with her three children, ages fifteen, fourteen, and ten. (R. at 304.) Plaintiff performs household chores including laundry, cleaning, cooking, paying bills and managing finances. (R. at 306-07, 310.) Plaintiff reported having problems remembering things, organizing herself, concentrating, and trusting others. (R. at 89-90, 95-96, 108.) Plaintiff also reported becoming easily stressed. (R. at 95.) Plaintiff also helps her mother with household activities like grocery shopping and paying bills. (R. at 308.) Although Plaintiff does not drive, Plaintiff does use public transportation to get around but has difficulty with directions. (R. at 310.) Plaintiff walks to her GED classes, which are six blocks

- 7 -

from her home. (R. at 302-03.) Plaintiff also testified that on occasion she goes out socially. (R. at 311-13.)

In August 2001, Plaintiff went to St. Anthony's Hospital because she was feeling anxious and stressed. (R. at 171-73, 318.) Plaintiff claimed that she stays to herself and becomes nervous when she is around a lot of people. (R. at 320.) When testifying about her history of abuse, Plaintiff stated that "nothing is where [she couldn't] handle it at this time," and she took Zoloft to help her with her symptoms. (R. at 322.)

Plaintiff testified that she experienced back pain from being on her feet for long periods of time, and that the pain usually began late in the day. (R. at 315-16.) She also reported problems with lifting, prolonged sitting, moving items and cleaning her apartment. (R. at 323-24, 334.)

## D. VE's Testimony

The VE testified, and the ALJ agreed, that Plaintiff's past work did not constitute substantial gainful activity ("SGA"). (R. at 16-17, 336.) The VE also testified that a hypothetical individual with the same vocational profile as Plaintiff could perform simple, unskilled work, bend from the waist and crouch frequently, stoop, lift up to twenty pounds occasionally and ten pounds frequently, stand/walk for six of eight hours, sit for two of eight hours and interact with the public and co-workers occasionally. (R. at 336-38.) The VE identified jobs that Plaintiff could perform in the national economy, including assembler (7,000 jobs), hand packager (7,000 jobs), and inspector (6,500 jobs). (Id.) The VE also testified that if, as a result of mental impairments, an individual were not able to stay on-task for at least 90% of the workday, she

- 8 -

would be unable to sustain employment. (R. at 338-39.) Additionally, the VE testified that a person could not generally take breaks outside of set break times in the jobs he identified. (R. at 339-40.)

### III. ALJ's Findings

The ALJ made the following specific findings:

1.  The claimant has not engaged in SGA since the alleged onset of disability.

2.  The claimant's depression, BIF, mild scoliosis, minimal degenerative (arthritis) changes in the spine and PTSD with annulus tear L5-S1 are considered "severe" based on the requirements of the regulations. 20 C.F.R. § 416.920(b).

3.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  The claimant's allegations regarding her limitations are credible.

5.  The claimant has the residual functional capacity ("RFC") to perform simple unskilled work at the light exertional level with no more than frequent stooping or crouching and minimal interaction with the public and co-workers.

6.  The claimant has no past relevant work.

7.  The claimant is a "younger individual" under 20 C.F.R. § 416.963.

8.  The claimant has a marginal eighth grade education with special education classes.

9.  The claimant has the RFC to perform a significant range of light work.

10. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making and Social Security Regulations[5] ("SSR") 96-9p and 85-15, there are a significant number of jobs in the greater Chicago metropolitan area economy she could perform. Examples of such jobs include work as assemblers 7,000, hand packagers 7,000, and inspectors 6,500.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(R. at 22.) The ALJ concluded that, based upon her October 17, 2001 application, Plaintiff is not eligible for SSI payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act. (R. at 23.)

## IV. **Discussion**

In order to qualify for SSI payments an individual must meet the statutory standard for disability, which requires the "inability to engage in any [SGA] by reason of any medically

---

[5] Social Security Rulings are binding upon all aspects of the SSA. 20 C.F.R. § 402.35(b)(1). *See also Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

determinable physical or mental impairment" that has lasted or can be expected to last not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The determination of disability involves a five-step sequential analysis that considers both medical and vocational factors. The five steps are:

Step 1: Is the claimant engaged in SGA? If yes, the claimant is not disabled. If no, the inquiry proceeds to Step 2.

Step 2: Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least twelve months? If no, the claimant is not disabled. If yes, the inquiry proceeds to Step 3.

Step 3: Does the claimant's severe impairment meet or equal the severity of an impairment listed in the appendix 20 C.F.R. § 404, Subpt. P, App. 1? If yes, the claimant is disabled. If no, the inquiry proceeds to Step 4.

Step 4: Can the claimant still perform past relevant work? If yes, the claimant is not disabled. If no, the inquiry proceeds to Step 5.

Step 5: Is the claimant able to perform any other work within her RFC in the national economy? If yes, the claim is denied. If no, the claimant is disabled.

20 C.F.R. § 404.1520(a)(4)(i)-(v). *See also Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994). The ALJ must consider an assessment of the claimant's RFC at Steps 4 and 5 of the inquiry. The RFC is an assessment of what the claimant can still do despite her limitations, based upon all relevant evidence. 20 C.F.R. § 404.1545(a). The RFC assessment helps in the

evaluation of the types of work available to an individual with specific limitations. Id. The ALJ has the final responsibility of deciding the claimant's RFC. 20 C.F.R. § 404.1527(f)(2).

The claimant bears the burden of proof through Step 4 of the five-step inquiry; the burden of proof shifts to the Commissioner at Step 5. *Herron*, 19 F.3d at 333 n.8. The claimant's burden of proof includes providing medical evidence substantiating the assertion of a disability. *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994). At any step in the five-step inquiry, if the ALJ determines that the claimant is not disabled, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The ALJ is required to consider all evidence, explain the reasons for his determination in a manner sufficient to permit an informed judicial review, and build an accurate and logical bridge between the evidence and the result. *Clifford v. Apfel*, 227 F.3d 863, 871-72 (7th Cir. 2000).

In this case, the ALJ used this five-step process in making his findings, and determined that Plaintiff was not disabled at Step 5. Relying on Plaintiff's RFC assessment and the VE's testimony, the ALJ determined that Plaintiff was able to perform work existing in significant number in the national economy and was therefore not disabled. (R. at 21-23.)

Section 205(g) of the Social Security Act grants federal courts the authority to review final decisions of the Commissioner with the power to affirm, modify or reverse, with or without remand to the Commissioner for rehearing. 42 U.S.C. § 405(g). The scope of the review is limited; while this Court should not act as an "uncritical rubber stamp," *Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986), it is improper for this Court to reweigh evidence, decide facts anew or substitute judgment for that of the ALJ's. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The Court will affirm the Commissioner's decision as long as it is supported by

substantial evidence. *Id.* Evidence is considered substantial if a reasonable person would accept it as adequate to support the ALJ's conclusion. *Id.* Therefore, if reasonable minds could disagree about whether Plaintiff is disabled, the Court will affirm the decision of the ALJ. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

Plaintiff contests the ALJ's determination that she was not disabled on three primary grounds. Plaintiff argues that: (1) the ALJ failed to consider 20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.05(C), the SSA's listing for mental retardation; (2) the ALJ's finding that Plaintiff could work was not supported by substantial evidence, particularly given the VE's testimony and the medical evidence of Plaintiff's limitations as a whole; and (3) having accepted Plaintiff's testimony as basically credible and consistent with medical evidence, the ALJ erred in denying Plaintiff's claim. The Commissioner rejects all of Plaintiff's arguments.

## A. The ALJ Properly Considered the Relevant Listing.

At Step 3 of his five-step inquiry, the ALJ determined that Plaintiff did not meet or equal the criteria of any listings in 20 C.F.R. § 404, Subpt. P, App. 1. (R. at 22.) Plaintiff argues that the ALJ erred by not specifically addressing Listing 12.05(C), mental retardation, or Plaintiff's evidence in light of Listing 12.05. (R. at 16-23.)

### 1. The ALJ did not explicitly mention Listing 12.05.

The reviewing court is primarily concerned with tracing the ALJ's logic and reasoning when considering an appeal from the SSA. Thus, while remand is not automatically necessary when the ALJ fails to explicitly refer to a relevant listing, *Rice v. Barnhart*, 384 F.3d 363, 369-70

(7th Cir. 2004), remand may be necessary where failure to explicitly refer to a relevant listing is combined with a perfunctory analysis. *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). Therefore, it is required that the ALJ explicitly clarify why Plaintiff is not disabled at Step 3 and not simply repeat a medical examiner's finding that no listings were met or equaled. *Rice*, 384 F.3d at 370 (determining that remand is necessary where ALJ "omits reference to the applicable listing and provides nothing more than a superficial analysis"); *Brindisi*, 315 F.3d at 786 (failure to discuss or even cite a listing, combined with otherwise perfunctory analysis, may require a remand); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (ALJ's failure to reference applicable listing left court with grave reservations as to whether ALJ's factual assessment adequately addressed the criteria for the listing).

While the ALJ did not cite Listing 12.05(C) in his findings, nor discuss the requirements of the listing, his analysis was neither perfunctory nor superficial. In his decision, the ALJ describes how Plaintiff's psychological examination revealed that Plaintiff suffers from adjustment disorder with mixed anxiety and depressed mood, and BIF with no limitations in activities of daily living. (R. at 18.) The ALJ then discussed Dr. Wharton's November 30, 2001 findings, citing directly to Dr. Wharton's evaluations labeled Exhibits 7F and 8F, though not mentioning Dr. Wharton by name. (Id.) The ALJ recounted that Dr. Wharton completed an MRFC based on the diagnosis of adjustment disorder (mixed) and BIF and determined that Plaintiff's impairments would interfere with her ability to perform complex tasks but not her ability to perform and sustain simple tasks. (Id.) Significantly, in Exhibits 7F and 8F, Dr. Wharton performed psychiatric review and MRFC evaluations that focused on Listings 12.04 and 12.05. In both instances, Dr. Wharton concluded that Plaintiff's impairments did not

precisely satisfy the diagnostic listing. (R. at 144-45.) Based, in part, on Plaintiff's psychological examination, Exhibit 7F, and Exhibit 8F, the ALJ made the following Step 3 finding:

> The medical evidence indicates that the claimant has depression, [BIF], mild scoliosis, minimal degenerative (arthritis) changes in spine and [PTSD] with annulus tear L5-S1, impairments that are "severe" within the meaning of the Regulations but not "severe" enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

(R. at 19.) Based on these statements, the Commissioner argues that Plaintiff does not meet Listing 12.05(C). Because the ALJ was permitted to rely on Dr. Wharton's findings, *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (consulting physician's opinion may have the advantage of both impartiality and expertise); 20 C.F.R. §§ 404.1527(f), 416.920a(e); SSR 96-6p (State Agency physicians are highly qualified physicians who are experts in Social Security disability evaluation.), and because the ALJ built an accurate and logical bridge between the evidence and the result in his decision, the Court will not disturb his Step 3 finding. *See Clifford*, 227 F.3d at 871-72.

Plaintiff suggests that Dr. Wharton's opinion is not accurate because he did not have all the relevant evidence when he reached his conclusions. In particular, Plaintiff claims that records from Ms. Glenn, (R. at 205), Jackson Park Hospital, (R. at 215), and some records from the St. Anthony and Mercy hospitals were not available to Dr. Wharton in November 2001. (R. at 170.)

Plaintiff's argument fails. As stated above, Ms. Glenn reported that Plaintiff suffers from depression and long-standing PTSD, Dr. Qureshi (at Jackson Park Hospital) believed that Plaintiff suffers from depression, anxiety, and panic attacks, and medical records from

- 15 -

St. Anthony Hospital reveal Plaintiff's complaints of stress and back problems. In his report, Dr. Wharton specifically incorporated depression and adjustment disorders, (R. at 144-45), and noted Plaintiff's anxiety issues. (R. at 153.) Dr. Wharton also reviewed the University of Chicago Hospital notes that found Plaintiff "experiences recurrent anxiety." (R. at 116, 153.) Thus, while Dr. Wharton did not have all of the medical evidence available to him in November 2001, with the exception of PTSD, his report explicitly noted each of the allegedly significant findings that Plaintiff raises in her reply brief. Significantly, Ms. Glenn believes Plaintiff's PTSD is a long-standing condition resulting from abuse she suffered as a child, and certainly not a condition that developed after Dr. Wharton's evaluation, nor after the examinations conducted by Dr. Knopf or the University of Chicago physicians. Furthermore, Ms. Glenn found that many of Plaintiff's symptoms improved after her daughter's allegations of abuse proved to be unfounded. It follows that Plaintiff has not established that Dr. Wharton's conclusions were discredited by subsequent medical findings.

2. Plaintiff's evidence does not satisfy the requirements set out in Listing 12.05.

Next, Plaintiff argues that she meets the requirements set out in Listing 12.05(C). Specifically, Plaintiff contends that her medical evidence satisfies both the introductory paragraph to Listing 12.05 ("the capsule") and subpart (C) of Listing 12.05, which requires evidence of a valid verbal, performance, or full scale IQ of 60 through 70, and evidence of a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. § 404, Subpt. P, App. 1, § 12.05(C). The Commissioner

disagrees and argues that Plaintiff does not meet Listing 12.05's capsule requirement because she

cannot show that she was ever diagnosed as mentally retarded or that she has significantly

subaverage general intellectual functioning with deficits in adaptive functioning initially

manifested before age twenty-two.

Listing 12.05 is set out in 20 C.F.R. § 404, Subpt. P, Appendix 1, § 12.05. The capsule to

Listing 12.05 reads:

> 12.05 *Mental retardation:* Mental retardation refers to significantly subaverage
> general intellectual functioning with deficits in adaptive functioning initially
> manifested during the developmental period; *i.e.*, the evidence demonstrates or
> supports onset of the impairment before age 22.
>
>> The required level of severity for this disorder is met when the
>> requirements in A, B, C, or D are satisfied.

Subpart (C) of Listing 12.05 reads:

> C.    A valid verbal, performance, or full scale IQ of 60 through
>       70 and a physical or other mental impairment imposing an
>       additional and significant work-related limitation of
>       function.

Assuming that Plaintiff's IQ scores and physical impairments meet the requirements set

out in subpart (C) of Listing 12.05, Plaintiff still must show that she meets Listing 12.05's

capsule requirement. 68 Fed. Reg. 74279-01, 74280 (claimant must also satisfy the capsule

definition of mental retardation in order to meet Listing 12.05(C)). *See also Barnes v. Barnhart,*

116 Fed. Appx. 934, 938-39 (10th Cir. 2004) (unreported). Plaintiff does not claim that she was

ever diagnosed with mental retardation, so the Court focuses on whether Plaintiff has

significantly subaverage general intellectual functioning with deficits in adaptive functioning

initially manifested before age twenty-two.[6]  Plaintiff argues that her poor academic history and her difficulty with follow-through, organization, and performing activities of daily living, satisfy the capsule requirement. (Pl.'s Reply at 10.) Other than her poor academic performance, however, Plaintiff's evidence is unconvincing.  As the ALJ noted in his decision, Plaintiff runs errands for her mother, goes shopping, takes her laundry out to wash, pays her bills using money orders and cash, does all household chores, including cooking and cleaning, goes to the movies and goes out with acquaintances romantically. (R. at 17.)  While Plaintiff focuses on University of Chicago Hospital findings that Plaintiff has moderate difficulties with daily living and social functioning, (R. at 115), Plaintiff ignores the fact that these same doctors found that she could function in society (albeit at a slower than average pace) and that her tendency to give up prematurely on testing may have resulted in unnaturally low IQ scores. (R. at 115-16.)  In short, Plaintiff's evidence of social impairments does not persuade the Court to reverse the ALJ's determination that Plaintiff is "fairly strong in activities of daily living and has a social and romantic life." (R. at 20.)

Plaintiff fails to meet any of the possible tests that might satisfy Listing 12.05's capsule requirement, so Plaintiff does not meet the Listing 12.05(C) and the ALJ's Step 3 finding is upheld.

---

[6]  A specific diagnosis of mental retardation may not be the only way to satisfy the diagnostic description in the introductory paragraph of Listing 12.05.  While the Seventh Circuit has not specifically addressed the issue, in *Maresh v. Barnhart*, 438 F.3d 897, 899-900 (8th Cir. 2006), the Eighth Circuit found that nothing in the plain language of the regulation indicates that a claimant must provide a specific diagnosis of mental retardation to satisfy the capsule.  This finding is consistent with the SSA's determination that the "definition of [mental retardation] is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over the other." 67 Fed. Reg. 20,022.

**B.     The ALJ's Finding That Plaintiff Could Work Was Supported
         By Substantial Evidence.**

Plaintiff claims that the ALJ ignored evidence that did not support his conclusion. Plaintiff argues that the evidence as a whole demonstrates greater psychological limitations than those found by the ALJ, particularly in maintaining attention and concentration and being able to stay focused and on-task. (Pl.'s Br. at 12-14.)  Because the VE testified that the inability to maintain attention and concentration or to stay focused and on-task are significant limitations, Plaintiff argues that the ALJ erred in finding that Plaintiff maintained the MRFC to perform simple, unskilled work that involves minimal interaction with the public and co-workers.  (R. at 19-20, 22.)

An ALJ need not discuss every individual piece of evidence so long as he sufficiently articulates his assessment of the relevant evidence enough to assure the reviewing court that the important evidence was in fact considered. *Herron*, 19 F.3d at 333.  The ALJ's decision, however, must be supported by the evidence as a whole. *Bauzo*, 803 F.2d at 923 (determining that the ALJ's decision must be based upon "fair and impartial presentation of all medical evidence that is credible, supported by clinical findings, and relevant to a particular issue"). While the ALJ need not articulate his reasons for rejecting every individual piece of evidence, he must at least minimally discuss evidence that contradicts his conclusion. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).  Both evidence favoring Plaintiff as well as the evidence favoring the rejection of Plaintiff's claim must be examined since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight. *Id.*  The ALJ must also supply an accurate, logical bridge between the evidence and the result.

The ALJ based his MRFC conclusion in large part on (1) Dr. Wharton's opinion that Plaintiff retains the mental capacity to perform simple tasks, (2) Plaintiff's therapist's findings that much of Plaintiff's depression, frustration and stress was connected with the Department of Children and Family Services (DCFS) investigation of sexual abuse allegations made by her daughter, who subsequently admitted that the allegations were untrue, (R. at 19-20), and (3) the ALJ's observation that Plaintiff is fairly strong in activities of daily living and has a social and romantic life. (Id.) The ALJ also found it significant that "there is no medical opinion in the record that states/concludes that the claimant is 'unable to work' by her mental or physical impairments, singly or the combination of them." (R. at 19.)

Plaintiff argues that the ALJ disregards significant evidence favoring her claim. Specifically, Plaintiff alleges that (1) the ALJ does not address those records from Plaintiff's treatment at Mercy Hospital that describe Plaintiff's cognitive deficiencies, confused thinking, difficulty coping with daily problems, difficulty performing activities of daily living, and problems trusting others, (R. at 184, 186, 188, 193, 190, 197, 199, 203), (2) the ALJ does not address Dr. Wharton's conclusion that Plaintiff would have moderate restriction in activities of daily living, moderate difficulty maintaining social functioning and concentration, persistence or pace, and moderate limitations in the ability to maintain attention and concentration for extended periods of time, (R. at 151, 155-57), (3) the ALJ does not address the fact that Plaintiff's GAF score was consistent with serious functional impairments, and (4) the ALJ ignores the fact that Plaintiff may be off-task for more than 10% of each work day, making it impossible for Plaintiff to remain employed. Each of these arguments are addressed in turn.

Mercy Hospital records suggest that Plaintiff suffers from a variety of mental impairments. While the ALJ did not include all of these findings in his decision, he did note that St. Anthony Hospital and Mercy Hospital reported that Plaintiff suffers from anxiety and stress with episodes of tearfulness and assessments of dysthymia and psychosis not otherwise stated. (R. at 18.) Significantly, the ALJ's discussion of Mercy Hospital records is accompanied by discussion of findings and observations that Plaintiff is strong in activities of daily living and capable of functioning in the work place. And, as stated above, the ALJ relied on Ms. Glenn's findings that Plaintiff's depression, frustration, and stress improved after the DCFS investigated her daughter's claims of abuse. (R. at 20.) Based on the decision as a whole, the Court cannot say that the ALJ ignored unfavorable evidence generated by Mercy Hospital.

Next, Dr. Wharton found that Plaintiff suffered a variety of moderate mental impairments but concluded that Plaintiff retained the capacity to perform simple work. While Plaintiff faults the ALJ for not discussing each impairment in Dr. Wharton's report, these impairments must be evaluated in the proper context. No party to this case and no examining physician suggests that Plaintiff is perfectly healthy. Rather, the general consensus is that, despite some moderate impairments, Plaintiff is capable of working. This was certainly Dr. Wharton's conclusion and the suggestion that Dr. Wharton's findings might support a finding of "disabled" is baseless.

Plaintiff also claims that the ALJ should have discussed the significance of her GAF score in greater detail. Plaintiff's GAF score was a 45. As noted above, a GAF between 41 and 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. The ALJ included Plaintiff's GAF score in his decision but did not discuss its significance. Nonetheless, Plaintiff's GAF score was available to various medical examiners

upon whom the ALJ relied, the ALJ did not ignore the GAF score, and the ALJ provided sufficient medical evidence to support his decision. It follows that this Court will not reweigh the significance of the GAF score, nor rely on it to reverse the ALJ's decision.

Finally, Plaintiff suggests that the ALJ erred by not considering the fact that she had difficulty remaining focused and would be off-task for at least 10% of each work day. As the ALJ notes in his decision, Plaintiff's difficulty-staying-on-task argument is "unsupported by any explicit medical statements of that opinion." (R. at 19.) The ALJ goes on to show that SSA medical examiners found Plaintiff capable of performing simple tasks and that Ms. Glenn found Plaintiff's depression, frustration, and stress had greatly improved. (R. at 19-20.) Because Plaintiff's speculative arguments and assumptions do not create actual medical issues, there is no basis for the ALJ to seriously consider whether Plaintiff will be off-task for more than 10% of every work day.

Plaintiff fails to raise any genuine shortcomings in the ALJ's decision so the Court finds the ALJ's MRFC conclusion that Plaintiff can perform simple work is supported by substantial evidence in the record.

## C.     The ALJ's Credibility Finding Does Not Require Him To Find Plaintiff Disabled.

Plaintiff argues that, having accepted her testimony as basically credible and consistent with the medical evidence, the ALJ erred when she denied Plaintiff's claim.

Plaintiff testified that (1) she had problems staying organized, focused and on-task, (2) she felt overwhelmed, (3) she suffered from PTSD, and (4) she had problems sleeping. (R. at

311, 318, 321, 325.) The ALJ found Plaintiff's testimony to be credible but her impairments not severe enough for Plaintiff to be considered disabled. (R. at 19.) Specifically, the ALJ found that evidence in the record established that Plaintiff's difficulty focusing does not prevent her from performing simple tasks and SGA, Plaintiff's depression and stress were situational and resolved, and Plaintiff was strong in the activities of daily living. (R. at 19-20.)

While the law requires an ALJ to weigh all credible evidence and make impartial factual findings, it does not compel an ALJ to accept the claimant's perception of her disability in its entirety. *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). Nothing in Plaintiff's testimony is completely inconsistent with the ALJ's findings that Plaintiff is not disabled. Therefore, the ALJ's general finding that Plaintiff's testimony is credible does not require a specific outcome in this case.

## V.  Conclusion

For the reasons stated above, the Court upholds the Commissioner's final decision and grants her motion for summary judgment. For the same reasons, the Court denies Plaintiff's motion for summary judgment.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: August 31, 2006.                                        United States Magistrate Judge

- 23 -

Copies have been mailed to:

ROBERT C. KIELIAN, Esq.               MR. DONALD R. LORENZEN
M. JACQUELINE WALTHER, Esq.     Assistant United States Attorney
Kielian and Walther                      219 South Dearborn Street
33 West Jackson Boulevard         5th Floor
Suite 201                            Chicago, IL 60604
Chicago, IL 60604

Attorneys for Plaintiff                Atttorney for Defendant